IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CR-23-388-G |
| | ) | Case No. CR-00-74-G |
| RONNIE GERALD WIGGINS, | ) | |
| | ) | |
| Defendant. | ) | |

* * * * * * *

TRANSCRIPT OF PROCEEDINGS

HAD ON NOVEMBER 16, 2023, AT 10:45 A.M.

BEFORE THE HONORABLE CHARLES B. GOODWIN

U.S. DISTRICT JUDGE, PRESIDING

* * * * * * *

REVOCATION HEARING/MOTION TO SUPPRESS

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

# A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

Mr. Daniel Gridley
Assistant United States Attorney
U.S. Attorney's Office
210 West Park Avenue
Suite 400
Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANT:

Ms. Bonnie Blumert
Ms. Laura Deskin
Assistant Federal Public Defenders
215 Dean A. McGee Avenue
Suite 109
Oklahoma City, Oklahoma 73102

# I N D E X

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT RE: SUPPRESSION MOTION:

KOLTON ROBERTSON
Direct Examination by Mr. Gridley ............12
Cross-Examination by Ms. Blumert .............26
Redirect Examination by Mr. Gridley ..........34
Examination by the Court .....................36
Recross-Examination by Ms. Blumert ...........37

GOVERNMENT RESTS ON SUPPRESSION MOTION ............40

EVIDENCE ON BEHALF OF THE DEFENDANT RE: SUPPRESSION MOTION:

STEVE RITCHEY
Direct Examination by Ms. Blumert ............41
Cross-Examination by Mr. Gridley .............46

DEFENDANT RESTS ON SUPPRESSION MOTION .............47

EVIDENCE ON BEHALF OF THE GOVERNMENT RE: REVOCATION:

EVAN LOEWER
Direct Examination by Mr. Gridley ............48
Cross-Examination by Ms. Blumert .............56
Redirect Examination by Mr. Gridley ..........57

BRIAN ANDERSON
Direct Examination by Mr. Gridley ............58

STEVE RITCHEY
Direct Examination by Mr. Gridley ............60
Cross-Examination by Ms. Blumert .............63

GOVERNMENT RESTS ON REVOCATION MOTION .............66

CERTIFICATE OF REPORTER ...........................67

P R O C E E D I N G S

(The following proceedings were had November 16, 2023, with Court, counsel, and defendant present:)

THE COURT: I apologize. We had -- I think, as everyone is aware, we had a slight technical issue and so we are getting started just a bit late.

The Court calls the Case No. CR-23-388 and CR-00-74, both labeled United States vs. Ronnie Gerald Wiggins. In the '23 case, we're here for a hearing on the motion to suppress filed by the defendant, and then the 2000 case we're here on a petition by the government for revocation of the defendant's term of supervised release.

Counsel for the defendant had requested that the matters be scheduled for the same time and date, but I'm going to ask about procedure. But we'll do that in just a moment.

First, I'll have counsel make their appearances.

MR. GRIDLEY: Good morning, your Honor. Daniel Gridley on behalf of the United States. With me at table is Special Agent Brian Anderson with the ATF as well as my paralegal, Cheryl Spano.

MS. BLUMERT: Bonnie Blumert and Laura Deskin for Mr. Wiggins.

THE COURT: All right. And Mr. Wiggins is here and present in the courtroom.

Okay. Let's talk about -- well, let me first ask and

verify, is the government in compliance with the Justice For All Act?

MR. GRIDLEY: Yes, your Honor.

THE COURT: All right. Then let's talk about our process and what would be the most effective way to go forward here.

What is the current request of counsel as far as, in particular, the hearing on the petition for revocation of the term of supervised release?

MR. GRIDLEY: Judge, with regard to that hearing, I intend to present four witnesses, one of which will be also a witness for the hearing on the motion to suppress, that being Officer Robertson. And so I would ask that we hear testimony from Officer Robertson at one time that applies to both hearings.

THE COURT: All right. What says counsel for the defendant? What's our best and most effective way to go forward?

MS. BLUMERT: I think it works well, Judge, to do the suppression hearing in its entirety, begin the revocation hearing, functionally have the government incorporate the testimony of Officer Robertson into the revocation proceeding, and then allow the government to put on its additional witnesses and then we'll make argument about the revocation.

I think what I'll probably be asking is if the Court

makes a finding that Mr. Wiggins, in fact, did violate his supervised release, that the Court withhold its ruling on the sentence just to ensure that Mr. Wiggins isn't taken to BOP prematurely before we have resolved the other case.

THE COURT: All right. Tell me, again, what's our overlap as far as witnesses and evidence?

MR. GRIDLEY: There is one witness, Officer Kolton Robertson --

THE COURT: Okay.

MR. GRIDLEY: -- who will be -- his testimony would apply to both of the hearings.

THE COURT: All right. And then there's other witnesses?

MR. GRIDLEY: Yes. That would simply be applicable only to the revocation proceeding.

THE COURT: All right.

MR. GRIDLEY: And, Judge, I --

THE COURT: Is there a difference between what you had suggested and what defense counsel had suggested?

MR. GRIDLEY: No. I don't really think so. As long as we are in agreement ahead of time that Officer Robertson's testimony, when he initially provides it, is applicable to both hearings.

THE COURT: All right. Okay. I think, in general, that's fine. I want to go through our preliminaries on the

petition for revocation of the defendant's term of supervised release and make sure that we're on a sound footing for that, and then I'm going to allow counsel to present your evidence and do it in whatever is the most effective way. And whether that's -- we simply talk about the evidence for the motion to suppress and argue that and then move on to the other or you do it all together, I'm going to leave up to you.

But let me start like this. Sir, I'll have you stand, Mr. Wiggins. And do you need a moment to talk to counsel?

THE DEFENDANT: Excuse me, your Honor?

MS. BLUMERT: We're ready, your Honor. I apologize.

THE COURT: Okay. I want to go through some basics about the petition for revocation of the term of supervised release in particular.

Would you state your name and your age for the record.

THE DEFENDANT: Ronnie Gerald Wiggins, 58.

THE COURT: All right. Are you the Mr. Wiggins named in the petition that's been filed in this case?

THE DEFENDANT: Yes, sir, I am.

THE COURT: All right. I take it that you understand the English language and have no need for an interpreter. Is that correct?

THE DEFENDANT: Pretty well, sir.

THE COURT: All right. I do want to remind you of rights that you have that are protected under our system of

law. Among those are that you have the right to remain silent both in court and out of court. That means you may not be compelled to make a statement or answer questions. If you choose to make a statement or answer questions, then what you say can be used against you.

Further, you have the right to counsel. So that means you have the right to meet with your attorney and prepare for court proceedings in this case. You also have the right to have your attorney with you at all court proceedings and also any out-of-court conferences that you might have with any government attorney or agent or other personnel relating to the allegations at issue in this case involving the revocation of the term of supervised release.

THE DEFENDANT: Yes, your Honor, I understand that.

THE COURT: All right. Are you under the influence of any drugs, medication, or alcohol, or subject to any mental health condition that would affect your ability to understand what's going on here today?

THE DEFENDANT: No, sir.

THE COURT: Okay. The government has charged you with violating certain conditions of your supervised release. The formal charge -- or the formal document that makes that charge is a petition. Have you received a copy of that?

THE DEFENDANT: Yes, sir.

THE COURT: And have you had an adequate opportunity

to review it and to talk to your attorney about the allegations against you?

THE DEFENDANT: (Inaudible.)

THE COURT REPORTER: I'm sorry. I didn't hear you.

THE DEFENDANT: Yes, your Honor, I have.

THE COURT: Say that again. I still didn't quite --

THE DEFENDANT: Yes, your Honor, I have.

THE COURT: Okay.

Let me ask counsel, what is the defendant's response at this time to the charges in the petition?

MS. BLUMERT: May I have just a moment, Judge?

THE COURT: Yes.

(Brief pause.)

MS. BLUMERT: Judge, Mr. Wiggins would like to stipulate to Allegations 4 and 5 of the petition and contest the first three.

THE COURT: All right. Okay. Then I'll have the defendant take a seat at this time.

All right. With that, I'm going to turn to evidence from the government, and here we're talking about evidence relevant to both the motion to suppress and the contested allegations in the petition for revocation of supervised release.

So you may call your first witness, or if there is any exhibits that you want to present without a witness, then tell me about those.

MR. GRIDLEY: Yes. Judge, I do intend to call several witnesses as mentioned earlier. Also, there are a number of exhibits -- I believe five exhibits that were previously submitted to the Court as part of defense's and adopted by -- on our half -- on our behalf in our response brief with regard to the motion to suppress.

In speaking with your deputy, I indicated that I intended to introduce, for the purpose of the hearing today, what was Exhibit 1 and Exhibit 4 that were submitted previously to the Court during the motion to suppress. And I would be moving that those exhibits be adopted as part of this hearing.

And I can move to admit them at the appropriate time, but your deputy indicated that he thought it would be appropriate to leave the same numbering system on those exhibits as we move forward in this hearing as they were provided in the defense's motion initially.

Is the Court agreeable with that or would you like me to --

THE COURT: I am. Tell me what we're talking about, specifically which --

MR. GRIDLEY: Exhibit --

THE COURT: Are these all the videos?

MR. GRIDLEY: Video -- Exhibit 1 is the body cam of Officer Kolton Robertson, and the other video that I would intend to admit, just as evidence in the revocation, is what

was previously submitted as No. 4, and that being the body cam video of Officer Evan Loewer, who conducted the search of the vehicle.

THE COURT: All right. And so in the briefing those are Defendant's Exhibit 1 and Defendant's Exhibit 4.

MR. GRIDLEY: Yes, your Honor.

THE COURT: Okay. Let's stick with that numbering.

Is there any objection to the Court's consideration of those exhibits?

MS. BLUMERT: No, your Honor.

THE COURT: All right. Then I will consider those.

Anything else to present by agreement or otherwise?

MR. GRIDLEY: I don't believe so, your Honor.

THE COURT: All right. Then you can call your first witness.

MR. GRIDLEY: Your Honor, at this time the government would call Officer Kolton Robertson.

THE COURT: Sir, please come forward and be sworn. I want you to come right up here next to the podium and the clerk will place you under oath.

THE CLERK: Please raise your right hand.

(The witness was duly sworn.)

THE CLERK: Thank you. Please have a seat right over there.

THE COURT: You may proceed.

MR. GRIDLEY: Okay.

**KOLTON ROBERTSON,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. GRIDLEY

Q Please state your full name, sir.

A Kolton Shane Robertson.

THE COURT: Let me get you a little closer to the microphone. And you can move that back to you.

THE WITNESS: Kolton Shane Robertson.

Q (By Mr. Gridley) Okay. What do you do for a living, sir?

A I'm a Norman police officer.

Q And how long have you worked with the Norman Police Department?

A Since April 5th of 2021.

Q Okay. And what is your duty assignment with the Norman Police Department?

A Patrol Division 3, or night shift.

Q Okay. And were you on duty and working back on October -- October 30th of 2022?

A Yes.

Q Okay. And did you have occasion to come into contact with someone that you eventually came to know as a Ronnie Wiggins?

A Yes.
Q And do you see that individual in court here today?
A Yes.
Q Will you describe where he is and what he's wearing?
A He's standing directly behind you wearing jail-issued oranges.
Q Okay.
MR. GRIDLEY: Judge, I would ask that the record reflect that the witness has identified the defendant.
THE COURT: So noted.
Q (By Mr. Gridley) Okay. Were you equipped with a body camera system that particular evening?
A Yes.
Q Okay. And how -- can you describe for the Judge briefly how that operates or functions?
Where is the -- where is the system mounted and how -- what triggers it to start?
A The system is mounted upon my outer vest I'm currently wearing. And whenever I press a button to activate it, it will record 30 seconds before I press that or record video. And whenever I press the button to activate it, it will start recording audio.
Q Okay. So you always get the first 30 seconds video only?
A Yes.
Q Okay. Around a little after midnight that evening, did

you receive a particular dispatch while you were on duty?
A Yes. I was dispatched to a DUI BOLO.
Q Okay. What do you mean by that?
A So we received multiple callers that a vehicle was driving erratically, and they believed that the person driving may be under the influence.
Q Okay. And is that -- how did you receive that information?
A That was through the radio and on our call screen on our mounted computer in our vehicles.
Q Okay. And I want to talk to you a little bit about the information that you received as part of that dispatch that evening.
Was it your understanding that there were multiple individuals, citizens, that had called 911 about this particular vehicle that was of concern?
A Yes.
Q And did the information those individuals provided include that there -- that the vehicle in question was driving erratically and all over the road?
A Yes.
Q Did the call dispatch provide you with information on the type and tag number of the vehicle?
A Yes.
Q Okay. And was that a white Mercedes SUV with a tag of

LZL-482?
A Yes.
Q And did they also provide you with the location information on this vehicle?
A Yes.
Q Okay.
A They advised that it would be at the McDonald's located at 351 East Robinson.
Q Okay. And is that where the vehicle initially was when the call first came out or is that just where you ended up meeting up with it?
A That is where I ended up meeting up with it. And as I was driving to the BOLO area, they advised that it had pulled into that parking lot.
Q Okay. Had you -- had the information been coming out on this vehicle for a significant distance leading up to that?
A Yes.
Q Do you have an idea of about how far?
A I believe that the first call came in at 36th and Robinson, which was approximately 3 to 4 miles away.
Q Okay. So the 911 callers had been following or tracking and providing information on this vehicle for quite a while?
A Yes.
Q Okay. Did all that lead you to believe that this was fairly significant in the way of erratic or dangerous driving?

A Yes.
Q Okay. Now, you indicated that you met up with this vehicle at the McDonald's near Porter and Robinson, is it?
A Yes.
Q Okay. And can you describe for the Judge your initial observations once you got there?
A Once I got there I saw the white Mercedes, as previously described, in the drive-through line of the McDonald's. The tag information that was provided by the callers was correct. Once I saw that vehicle, I just parked my car and got out to make contact with the driver.
Q Okay. Now, you and I have reviewed your body cam from this incident before; is that correct?
A Yes.
Q I want to call your attention, if we may -- moving to admit -- or, I guess, previously admitted Exhibit No. 1, which is your body cam video.
MR. GRIDLEY: And if we can go to 30 seconds -- 36 seconds into that video.
(A portion of Exhibit No. 1 was played for the Court and witness.)
MR. GRIDLEY: Go ahead and pause it there.
Q (By Mr. Gridley) Did you hear yourself do something at that point in time?
A Yes. At that point I was reading the tag information to

provide it to dispatch.
Q Okay. And why is it you do that?
A Every time that we make contact with a vehicle in any situation, we always add the tag information so that they know who we're out with in case something happens. And then it also runs an NCIC check on the vehicle for stolen and provides us with the registration.
Q Okay. So you get back a batch of information based on that request you've just made?
A Yes.
Q Okay. And is it normal for that process for you to get that information back to take several minutes?
A Yes. Sometimes it's instant, but there are certain circumstances where it could take a long period of time if dispatch is dealing with multiple calls. Or if a dispatcher might be new, it might take them a while to get that information input.
Q Okay. So as I understand it, there is a process where someone is sitting in your office somewhere, receives that information, and has to type it into a computer, I guess --
A Yes.
Q -- and then relay the information back to you?
A Yes.
Q Okay.
MR. GRIDLEY: And, Judge, I don't intend to -- I

wasn't planning to play through the entire video. I presume that the Court has had an opportunity to review.

THE COURT: I have reviewed the video --

MR. GRIDLEY: Okay.

THE COURT: -- so you don't need to go through it exhaustively.

MR. GRIDLEY: Okay.

THE COURT: I'll tell you, if it helps counsel for both sides, that the sequence and when the different events happened that were of interest in the briefing matters to me, and so I want to try to get some clarification on that. But I have reviewed the video.

Q (By Mr. Gridley) Okay. Next I'd like to move into 1 minute and 55 seconds into your body cam video.

If we can, 1 minute, 55 seconds, just pause it there for a second.

Q (By Mr. Gridley) Have you, at this point in time, obtained the defendant, Mr. Wiggins' ID card?

A Yes.

Q Okay. Did he provide that to you willingly?

A Yes.

MR. GRIDLEY: Go ahead and play.

(A portion of Exhibit 1 was played for the Court and witness.)

MR. GRIDLEY: We can go ahead and pause that again.

Q (By Mr. Gridley) Now, at that point in time, did you hear yourself reading some information off?
A Yes.
Q What were you doing at that point in time?
A At that point I was running Mr. Wiggins' name, date of birth to check for valid license status, and it would also run a warrant check.
Q Okay. Is that something you do as a standard process every time you conduct any type of a traffic stop?
A Yes.
Q Okay. Do you also oftentimes do that if you are just interacting with a citizen in some sort of basic interaction?
A Yes.
Q Okay. And when you do that, what type of information do you get back?
A I'll get back if their license is valid and if they have any wants or warrants, along with any kind of officer safety or further flags that have been put in NCIC.
Q Okay. And does that process also sometimes -- or typically take several minutes?
A Yes.
MR. GRIDLEY: I want to move ahead now to approximately 4:23 on the video. Maybe if you could back it up to about 4:20.
Q (By Mr. Gridley) And at this point in time have you moved

to the driver's side of the vehicle to interact with him?
A Yes.
Q And at this point in time had you already done -- we saw in the video a modified version of a horizontal gaze nystagmus test.
A Yes.
Q Okay. And after doing that test, did you notice any indications that you believed to indicate that the defendant was intoxicated at that time?
A No.
Q Okay. Were you still concerned about the driving behavior of the defendant?
A Yes.
Q Okay.
MR. GRIDLEY: If we can play it from that point, around 4:20.
(A portion of Exhibit 1 was played for the Court and witness.)
MR. GRIDLEY: If you can go ahead and pause right there.
Q (By Mr. Gridley) Were you able to hear that?
A Yes.
Q Okay. Do you -- you are having a little bit of conversation; is that correct?
A Yes.

Q Is that over the radio with dispatch?
A Yes, it was.
Q Do you have an earpiece on where you can hear things that we're not able to hear on the audio?
A Yes.
Q Okay. And what information did you receive at that point in time?
A At the time, dispatch advised me that Mr. Wiggins had a possible warrant through parole.
Q Okay. And you say the word "possible" warrant.
A Yes.
Q Is that unusual for them to term it as a "possible" warrant initially?
A Yes.
Q I said, Is that unusual?
A Oh, no, it is not unusual. Every warrant that is from a different agency that is not the City of Norman is initially considered a possible warrant until we are able to call that agency and confirm it through their records department.
Q Okay. So unless it's a City of Norman warrant, there is always going to be a confirmation process?
A Yes.
Q And did that mean to you that he likely had a warrant from some location?
A Yes.

Q Okay. Do you recall if you got -- what all information you received at that point in time about the warrant?
A I do not recall other than that it was through parole.
Q Okay. So based on that, did you direct Mr. Wiggins to move his vehicle off to the side somewhere?
A Yes.
Q And we've seen that on video. You parked his vehicle on the north side of the parking lot in front of the trash dumpster?
A Yes.
Q And is it typical for that process -- the confirmation process to take, again, several minutes?
A Yes. That process requires them to call the other agency and speak to a member of that agency to confirm the warrant.
Q Okay.
MR. GRIDLEY: And if we move now to approximately eight minutes into the video. I think we can get to that point in the process.
Q (By Mr. Gridley) This is after you have directed him to move his vehicle; is that correct?
A Yes.
Q And did you have another officer with you that kind of stayed with Mr. Wiggins at that point?
A Yes.
Q And did you go back to your car so you could conduct

further interaction or investigation into this warrant?
A Yes.
Q Okay.
MR. GRIDLEY: If we can go ahead and play the video at the eight-minute mark.
(A portion of Exhibit 1 was played for the Court and witness.)
MR. GRIDLEY: If I can pause it right there.
Q (By Mr. Gridley) Had you received some information back with regard to the arrest warrant at that point in time?
A Yes.
Q Okay. And you made -- what was the information you received?
A They advised me that the warrant for the parole violation stemmed from a murder conviction and also that Mr. Wiggins had several officer safety flags in NCIC and was possible -- has had violent tendencies in the past, which is why I asked for additional units to respond.
Q Is that what we heard you say, ask for a third officer?
A Yes.
Q Okay. Is that because of your -- the information you received, you believed that he might present violent tendencies if you go to place him under arrest?
A Yes.
Q Okay. And then what did you do at that point in time?

A At that point I got out of my vehicle and Officer Walker and I ordered Mr. Wiggins to step out of the vehicle and come to the back of his vehicle between our patrol cars and his vehicle.
Q Okay.
MR. GRIDLEY: If we can move it to about 9:30.
Q (By Mr. Gridley) Now, at this point in time you've moved up to the side of his vehicle, the white Mercedes; correct?
A Yes.
Q Okay.
MR. GRIDLEY: We can go ahead and play it from that point.
(A portion of Exhibit 1 was played for the Court and witness.)
MR. GRIDLEY: Pause it a second at that point.
Q (By Mr. Gridley) We can see fairly well there, but your -- it appears as if your camera was knocked off your vest. Is that correct?
A Yes.
Q Can you describe for the Judge how that all happened?
A Once I grabbed on to Mr. Wiggins' arm and attempted to place it behind his back to effect an arrest, he began pulling away from us and was trying to turn towards officers. And in the process of that, his elbow hit the side of my camera and knocked it off of my vest.

Q Okay. Was he clearly physically resisting your efforts --
A Yes.
Q -- to -- to place him into physical custody?
A Yes.
Q Okay. And at that point in time did a physical struggle or fight ensue?
A Yes.
Q Okay. Was -- did the defendant appear to be using all his strength that he had to try and resist your efforts?
A Yes.
Q Did it take multiple officers to eventually get him cuffed and into custody?
A Yes.
Q And after he was eventually placed into custody, was he arrested and taken down to your station?
A Yes. He was taken to Cleveland County Detention Center.
Q Okay. And as part of that process, was his vehicle impounded and towed away?
A Yes.
Q Okay. And did you, at that point, kind of split up or divvy up duties as it related to that process?
A Yes.
Q Okay. And did you have another officer conduct a search of the vehicle pursuant to that process?

A Yes.
Q And was that Officer Evan Loewer of your department?
A Yes.
Q Okay.

MR. GRIDLEY: Judge, at this time I would pass the witness. I would ask that it's made clear on the record that the body cam, Exhibit No. 1, be admitted both as part of the suppression hearing as well as part of the revocation hearing.

THE COURT: All right. And it is.

MR. GRIDLEY: Okay.

THE COURT: Any questions from the defendant?

MS. BLUMERT: Yes, Judge.

**CROSS-EXAMINATION**

BY MS. BLUMERT

Q So, Officer Robertson, when you first get there, you call the license plate in first; correct?
A Yes.
Q Just before making any contact with the driver?
A Yes.
Q Okay. And then you called the information from his license -- his driver's license sometime later after you had talked to him; correct?
A Yes.
Q After you spoke with him, it seems like you pretty quickly figured out this guy is not intoxicated; right?

A Yes.
Q And at that point and throughout -- kind of throughout the rest of that interaction with him over the course of those maybe eight minutes, he hadn't done anything else that made you particularly nervous about him; correct?
A No.
Q When you call in for that warrant check from his driver's license, you are just calling the person that's at dispatch; correct?
A That is being relayed to our dispatchers, yes.
Q Is it being relayed from somebody else?
A No. It goes directly to dispatch.
Q And then they will radio back to you with any information they have?
A Yes.
Q Okay. So you get the information about warrants audibly from dispatch?
A Yes.
Q Are there anything that comes in from the computer or your call screen or anything like that?
A Yes. We can receive the same information on our computer and we can also sometimes receive more detailed information. Whenever dispatch is giving us information, it's usually a quick synopsis versus on a computer you can see the full --
Q So when they radio it in, do they also always put it on

the computer?
A They will add it to the computer at some point. Sometimes there is a delay.
Q So you're not always looking in a certain place. You're just waiting wherever you may get the information?
A Yes.
Q So the first thing that you hear from dispatch is that they say that maybe there's a warrant?
A They said that there is a possible warrant, which is normal if the warrant is not through the City of Norman.
Q Is that -- the word "possible," is that the exact word that they used?
A It may change, the exact terminology. That's what I normally use and most dispatchers that I deal with will say possible warrant out of whatever agency it may be.
Q Do you recall on this day if that was the word they used to you?
A I do not recall their exact words.
Q So at the point that they say "possible," do they just automatically go follow up or do you have to request that?
A They will do that automatically.
Q And so at that point they kind of click off the radio, you guys both go about your business, and then you're just waiting to hear something back?
A Yes.

Q So at the point that they tell you there's a possible warrant, you haven't seen anything come across the screen or your car computer like that; correct?
A No. At that point I had not looked at my computer in reference to his warrants. I had seen call notes previously to arriving.
Q At the point that you hear that, is that the same moment when you're standing in front of the driver's side of his door after you've done the modified HGN test? That's the point when you hear there's a maybe warrant; right?
A Yes.
Q Is that the first time you've heard that?
A Yes.
Q When you told him there was a possible warrant for parole, then he acknowledged to you that he was on probation; right?
A Yes.
Q Could you -- I know he said that and it's sometimes kind of hard to understand him, but were you able to understand that that's what he said at the time or just by watching it back later?
A I understood that he told me he was on probation, yes.
Q Okay. And so at that point then you step out and -- or ask him to step out, so then you go back to your car; correct?
A I'm confused on your question. Sorry.

Are you talking about before I had him move his vehicle or whenever I had him step out of the vehicle?
Q Right after finding out from dispatch that there was a possible warrant, then you asked him to move over to the curb; correct?
A Yes.
Q And then he pulls over to the curb and you follow him; right?
A Yes.
Q Okay. At this point you still haven't heard anything?
A At this point I had already been told that there was a possible warrant. Other than that, no.
Q You haven't heard the confirmation?
A No, I have not.
Q So once he is off to the side, you start talking to him at his driver's side door; correct?
A Yes.
Q Kind of just talking about his time in prison and things like that?
A Yes.
Q At what point do you get confirmation?
A I got confirmation whenever I was seated in my vehicle, both reading it on the computer and dispatch advised that the warrant was confirmed.
Q That's when they told you that it was -- had to do with

parole violation from a murder conviction; right?
A Yes.
Q So when they said that, they told you that it's confirmed this is valid?
A Yes.
Q Do you know what they were looking at when they said that?
A I do not. I wasn't in the dispatch center.
Q So you don't know whether it was just an NCIC hit?
A I don't know what -- I can't testify to what the dispatcher was looking at.
Q They didn't mention anything about whether it was a court filing or whether they found the physical warrant itself or anything like that?
A All that they told me was that the warrant was confirmed.
Q So when they say that -- excuse me.
When that -- was that something that you just heard audibly on your radio?
A Yes.
Q Nothing came up on the screen?
A I could see the NCIC entry for the warrant, but I previously stated they have to call the agency to confirm those.
Q Did they tell you that they had spoken with the agency?
A They did not. All that they told me was that the warrant

was confirmed through their processes.

Q And so then that's when you radio for other officers and then begin to go detain him; correct?

A Yes.

Q Excuse me. Physically detain him; right?

A Yes.

MS. BLUMERT: May I have a moment, Judge?

THE COURT: Yes.

(Brief pause.)

Q (By Ms. Blumert) At that part of the body camera that we watched, at about 4 minutes and 23 seconds, when you first get the call over dispatch saying there's a possible warrant -- do you recall the time I'm talking about?

A Yes.

Q You respond, and it sounds like in the video that you say "They said they can't confirm it." Does that sound right?

A Yes.

Q Okay. Who was "they" that you're talking about in that sentence?

A I was referring to dispatch.

Q But you were talking to dispatch; right?

A At that time I was speaking to the other officer that was on the other side of the car. I was not speaking on the radio.

Q When you said, "They can't confirm it," you were talking

to Officer Walker?
A Yes.
Q But it's a question; right?
A Yes, it was a question.
Q And so are you just checking with him to see if that's what he heard?
A Yes.
Q So you were saying dispatch said that dispatch can't confirm it?
A Yes.
MS. BLUMERT: May I have another moment, Judge?
THE COURT: Yes.
(Brief pause.)
Q (By Ms. Blumert) As you were attempting to handcuff Mr. Wiggins, he was surprised; right?
MR. GRIDLEY: Objection. This is speculation.
THE COURT: Well, the witness can answer to the extent that it's based on your own observations.
THE WITNESS: I don't know what specific feelings he may have been feeling at the time.
Q (By Ms. Blumert) Did he seem shocked by what was happening?
A Potentially. Like I said, I don't know what he could have been feeling at the time.
Q He began to ask you why you were arresting him; right?

A Yes.
Q And asked several times, please tell me what's going on; right?
A Yes.
Q And at some point then you guys got into a physical scuffle before handcuffing him?
A Yes. Well, in the process of handcuffing him.
Q And at some point then you struck him in the face?
A Yes.
Q And he ended up on the ground?
A Yes.

MS. BLUMERT: Nothing further.

THE COURT: Any further questions from the government?

MR. GRIDLEY: Just a couple briefly, your Honor.

**REDIRECT EXAMINATION**

BY MR. GRIDLEY

Q You talked about receiving information from dispatch of a possible warrant, and you indicated that is a -- kind of a normal procedure; correct?
A Yes.
Q In your experience, when you receive information of a possible warrant, is that warrant confirmed the majority of the time?
A I'm sorry. Can you repeat the last part of your

question?
Q When you receive -- in your experience as a Norman officer, when you receive an initial word from dispatch that someone you're dealing with has a possible warrant, is it the majority of the time your experience that that warrant is eventually confirmed?
A Yes.
Q Also, you were asked just a minute ago about a statement you made to the effect of that the warrant couldn't be confirmed. Do you recall that?
A Yes.
Q I guess you asked that to the other officer with you?
A Yes.
Q Had you, at that point in time, received any information that the dispatcher had attempted to confirm the warrant but was unable to confirm it?
A No, I had not. I didn't know if they had attempted to confirm it or not. At that point I only knew they had an unconfirmed warrant.
Q So there was no information that led you to believe that that was not an actual warrant; is that correct?
A Yes.
Q Okay.
MR. GRIDLEY: That's all I have.
THE COURT: Any further questions from the

defendant?

MS. BLUMERT: No, your Honor.

THE COURT: All right. I've got a couple of questions, and then I'll allow counsel to ask anything further.

**EXAMINATION**

BY THE COURT

Q I want to make sure that I understand the sequence on your conclusion that there was no drunk driving versus the notification of a possible warrant.

And so I understand that all happened -- or at least the notice of the possible warrant happened around the 4:20, 4:30 mark; right?

A Yes, your Honor.

Q Okay. At what point had you decided that there was no issue as far as drunk driving?

A Upon the conclusion of the seated modified version of horizontal gaze nystagmus, your Honor.

Q All right. When was that?

A That was just seconds before we received the possible -- that there was a possible warrant through dispatch, your Honor.

Q All right. How many seconds? Are we talking about two or three? Are we talking about 20, 30?

A I do not recall the exact amount of time, your Honor.

Q At the point in time that you had decided that there was no drunk driving, were you still concerned about reckless driving or other traffic infractions or moving vehicle infractions by the defendant?
A I was concerned about the driving behavior, but I was not able to take enforcement action for those because they were not committed in my presence, your Honor.
Q Okay. All right.
THE COURT: Any further questions from the government based on those answers?
MR. GRIDLEY: No, your Honor.
THE COURT: Anything from the defendant that you want to ask based on my questions and answers?
MS. BLUMERT: May I just have a moment, your Honor?
THE COURT: Yes.
(Brief pause.)

**RECROSS-EXAMINATION**

BY MS. BLUMERT
Q Officer Robertson, I have some time stamps that may help you lay these out.
Would you disagree if I said that you finished the HGN test and conclude he's not intoxicated around the 3 minute and 17 mark? Does that sound about right?
A Maybe somewhere close to that, yes.
Q At that point then you kind of started talking to him,

like pay attention to your driving. Kind of start talking to him about that; right?
A I do not recall --
Q Okay.
A -- what I talked about after that.
Q At some point you tell him that you're waiting on a warrants check; right?
A Yes.
Q And that's about 30 seconds after you concluded that he wasn't intoxicated?
A Yes.
Q You still haven't heard yet, but that's just when you told him that you were waiting on that; right?
A Yes.
Q And then it's about 4 minutes and 23 seconds into your video -- so 50 seconds later, a minute later -- that you hear from dispatch there's a possible warrant. And then you said to Walker, They said they can't confirm it; right?
A Yes.
MS. BLUMERT: Would it assist the Court if we just played about that minute and a half of the video?
THE COURT: I don't think so. I just wanted to get some benchmarks, honestly, from the perspective of the witness. I'll tell you -- and you can either answer or ask questions about it -- one other point that I was curious about

was at what point the defendant's license and insurance information, if the officer had that, was returned to him.

MS. BLUMERT: May I inquire of the witness?

THE COURT: Yes.

Q (By Ms. Blumert) Officer, you took his license at the beginning of the stop; right?

A Yes.

Q And then held on to that through the duration of your interaction with him; right?

A Yes.

Q Okay. And he essentially got it back once he got booked into jail. Does that sound right?

A He wouldn't have physical possession of it there, but they would put it in his property, yes.

Q So him getting it back is that it was put into the property that the Cleveland County jail was holding for him?

A Yes.

Q Okay. So at no point for the rest of that stop did he get his license back?

A No.

MS. BLUMERT: Nothing further.

THE COURT: Anything from the government that you want to ask based on all of that?

MR. GRIDLEY: No, your Honor.

THE COURT: Okay.

Sir, thank you for your time and testimony. You are excused.

Any further witnesses from the government?

MR. GRIDLEY: Not as to the issue of the suppression motion but as to the revocation, yes.

THE COURT: All right. Let's go ahead and -- well, let me ask, is there a reason to go ahead and talk about the suppression motion first and hear argument on that rather than take the evidence on the revocation issue?

MR. GRIDLEY: Not from our perspective.

MS. BLUMERT: If I may, Judge, defense would like to call a witness as to the issue of suppression.

THE COURT: Okay. Do you want to do that now before we get to the other issue before the Court about revocation?

MS. BLUMERT: Yes.

THE COURT: Okay. And I don't care. This is an unusual hybrid hearing. I'm just trying to figure out the most efficient way to do it.

So I think it makes sense if that's all the government has as far as evidence on the suppression question.

Is that correct?

MR. GRIDLEY: Yes, your Honor.

THE COURT: All right. Then the defendant can call the witness and present any exhibits or evidence that you want to insofar as the issue on suppression.

MS. BLUMERT: Defense calls United States Probation Officer Steve Ritchey.

THE COURT: All right. Sir, please come forward and be sworn.

(The witness was duly sworn.)

THE CLERK: Thank you. Please have a seat.

**STEVE RITCHEY,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MS. BLUMERT

Q Sir, can you state your name for the record?
A Steve Ritchey.
Q How are you employed?
A I'm a United States Probation Officer for the Western District of Oklahoma.
Q Do you know a Ronnie Wiggins?
A I do.
Q How do you know him?
A I supervised him for a few months.
Q And what time period was that?
A Started 5/18 of '22 up until his arrest in November of '22.
Q May 18th of '22 is the date that he was released from custody?

A Yes.
Q And he was released from custody in Texas state prison; correct?
A Correct.
Q When parolees come into your office -- excuse me -- supervised release -- folks that you supervise, you always are looking to see if they have any pending matters or active cases anywhere; correct?
A That's correct.
Q Okay. To see if they have warrants or court costs or things they need to resolve?
A Not so much court costs because that doesn't show up on any of the records checks we run.
Q But you're looking for any other pending cases, other matters, things like that?
A Correct.
Q Okay. At some point with Mr. Wiggins did you see anything like that?
A No.
Q Didn't see warrants or anything?
A No.
Q Okay. And you had done your requisite checks?
A You have your initial one, and then every six months you have follow-up checks, yes.
Q And when you do those checks, what does that entail on

your end?
A They run an NCIC background check to see if there is any pending warrants or open cases or new arrests that they didn't tell us about.
Q And as of May of '22, you hadn't seen anything for Mr. Wiggins?
A No.
Q Okay. At some point does Mr. Wiggins tell you he thinks he might have something?
A He said something about a blue warrant. I didn't see anything. I told him I didn't see anything on there. So if it was an active warrant, it wasn't entered into NCIC.
Q And he was using the phrase "blue warrant"?
A Yes.
Q Okay. Is that a term you're familiar with?
A Not at all.
Q Okay.
A Or I am now, but I was not.
Q At the time? So when he tells you he has that, does he ask you to look into it to see if it's there? Or why is he telling you that?
A I don't know why he was telling me. I think because he was concerned about it. But everything I saw, there was nothing that showed up.
Q Okay. Were you -- did you call around to try to figure

out if there was anything?

A I had called the agency that released him to see if I could find any information, and I was transferred probably no less than six times, and nobody had a clue what I was talking about.

Q At some point did you call -- well, like the Texas parole division or their Department of Corrections or something like that?

A Yes.

Q And nobody could ever really confirm anything?

A No. They wanted to give me to the next person, and nobody could really direct me who to -- the appropriate person was to talk to.

Q From May of '22 to his arrest in October, do you know -- or you're not aware at any point that Mr. Wiggins went to court or went to a proceeding in Texas for that; correct?

A No. At least he never requested permission to go if he did.

MS. BLUMERT: May I have a moment, Judge?

THE COURT: Yes.

(Brief pause.)

Q (By Ms. Blumert) Do you know whether there is a valid warrant or active warrant for Mr. Wiggins out of Texas currently?

A I believe there is not. Whenever I finally got the

Norman police report, the warrant that was presented with the packet had a phone number on it. And whenever I called that phone number, I was put in touch with somebody who at least knew what I was talking about. And whenever that phone call was made was prior to his detention hearing not too long ago.

Q Here about maybe six weeks -- six to eight weeks ago?

A I don't even remember the last time we were in court on this.

Q So the last time that you had checked, sometime in fall, there was not an active or valid warrant in Texas for Mr. Wiggins; right?

MR. GRIDLEY: Your Honor, I've kind of let this go on a little bit, but I think this is irrelevant to the issue of suppression. I provided counsel with a copy of the warrant that was in place at the time.

I think what they're dealing with was what was maybe in place in May and then now here a few weeks ago. I don't see that any of this is really relevant.

THE COURT: Well, I'll allow the questions, and we can argue about whether it's relevant or not at a subsequent point.

Q (By Ms. Blumert) I'll ask the question again, Mr. Ritchey. So when you confirmed recently, there was no valid or active warrant for Mr. Wiggins?

A Not currently. It was dropped -- at the time of the

arrest, it was apparent that there was one, but it was dropped after the arrest and charges were filed. I can't remember the amount of time, but it was less than one month since the arrest and charges filed until it was dropped.

So I'm not exactly sure as to what the date was. I just remember it was pretty close to it being about the same.

Q Do you know why it was dropped?

A I do not.

MS. BLUMERT: Nothing further.

THE COURT: Any questions from the government?

MR. GRIDLEY: Very briefly.

**CROSS-EXAMINATION**

BY MR. GRIDLEY

Q I think I heard you under -- to testify that you know now at least that at the time of his arrest, October 30th of 2022, there was, in fact, a warrant for his arrest; is that correct?

A Yes, there was.

Q Okay.

MR. GRIDLEY: That's all I have.

THE COURT: Anything further from the defendant?

MS. BLUMERT: No, your Honor.

THE COURT: Sir, thank you for your time and testimony.

Any additional evidence from the defendant on the question of suppression?

MS. BLUMERT: No, your Honor. Defense rests.

THE COURT: Then let's turn to our second issue of the petition for revocation of supervised release.

Any evidence that the government wishes to present in that regard?

MR. GRIDLEY: Yes, your Honor. And I would, again, just -- I know we've talked about this but -- reiterate that I'd move that the testimony and evidence previously received by way of Officer Robertson be incorporated as to the revocation as well.

THE COURT: All right. I assume there is no objection to that.

MS. BLUMERT: Correct, Judge. No objection.

THE COURT: All right. Then that --

MR. GRIDLEY: Then I would call Officer Evan Loewer.

THE COURT: -- that evidence that has been presented previously will be considered in connection with the question of revocation, and we'll have the witness come forward.

Sir, please come forward and be sworn. I want you to come right up here next to the podium and the clerk will place you under oath.

THE CLERK: Please raise your right hand.

(The witness was duly sworn.)

THE CLERK: Thank you. Please have a seat.

THE COURT: I want you to pull that microphone just

a little bit closer. Very good.

You may proceed.

**EVAN LOEWER,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. GRIDLEY

Q Please state your name.

A Evan Loewer.

Q Okay. What do you do for a living, sir?

A I'm a Norman police officer.

Q Okay. How long have you worked as a Norman police officer?

A Since August of 2019.

Q Okay. I want to take you to the early hours of October 30th of 2022. Were you on duty working as a Norman patrol officer that early morning?

A Yes, sir.

Q And did you receive some sort of information with regard to an incident at the McDonald's near Porter and Robinson in Norman?

A Yes.

Q What was -- what was the initial information that you received?

A I was on another call on 12th -- near 12th and Alameda, I

think, and there was -- I think Robertson was going out on a traffic stop for something in that area.
Q Okay.
A So I knew his voice over the radio. We work together pretty regular. So I heard him go out on a traffic stop in that area, I think.
Q Okay. And then a little while later did something else over the radio get your attention?
A Yeah. It sounded like he was in a fight.
Q Okay. And so, based on that, did you respond to the McDonald's?
A Yes.
Q Okay. When you get to the McDonald's, can you describe what's going on?
A They had an individual already -- they had detained him. I turned -- I shut down my Code 3 response because they said they had somebody detained. I was maybe a quarter mile from there at the time. So when I pulled in, I parked, got out, and they had a subject detained on the ground in front of one of the cars.
Q Okay. And did you eventually come to learn that that was a Mr. Wiggins?
A Yes.
Q Okay. Were you equipped with a body cam that evening?
A Yes.

Q And was it -- did you activate it once you arrived on scene?
A Yes.
MR. GRIDLEY: Your Honor, at this time I'd move for admission of what has been previously submitted as part of defense and the government's exhibit as No. 4, the body cam of Officer Loewer.
MS. BLUMERT: No objection.
THE COURT: That evidence will be considered.
Q (By Mr. Gridley) So when you arrive on scene, is it determined that -- had it been determined that Mr. Wiggins was going to be arrested?
A I'm not sure. The radio traffic I got was that there was a fight going on, so I just responded to kind of help wherever it was needed. So when I showed up, he was detained on the ground.
Q Okay. So eventually, maybe shortly after, was it determined --
A Yeah.
Q -- that he would be arrested?
A Pretty shortly after they were like, Yeah, he is under arrest. So we helped search him, get him up on his feet, and put him in the patrol car.
Q Okay. Were you the person that was the primary officer making decisions on when or how he was going to be arrested?

A No.
Q Okay. And was it determined -- or had it been determined that there would be an impound and towing of his vehicle?
A Yes.
Q Okay. Is that normal for that type of situation?
A Yes.
Q Part of your department's policy and procedures?
A Yes.
Q And as part of that, do you always conduct a search of the vehicle before the tow company impounds the vehicle?
A Yes. We do an inventory search.
Q Okay. And did you, in fact, volunteer to do that inventory search of the vehicle -- Mr. Wiggins' vehicle?
A Yes.
Q Okay. And was that a white Mercedes SUV?
A Yes.
Q I want to --
MR. GRIDLEY: If we can pull up the search -- or the video, excuse me, Exhibit No. 4, at around the 6:45 mark. If you can play it from there.
(A portion of Exhibit 4 was played for the Court and witness.)
MR. GRIDLEY: Pause it right there just for a moment.
Q (By Mr. Gridley) You immediately, right off the bat,

found two magazines with ammunition; is that correct?
A Yes.
Q It may be a little bit difficult to see on the video. Where exactly did you find those?
A They're in the side compartment in the driver door.
Q So like a map pocket on the driver door?
A Yes.
Q Okay. How would you describe the condition of this vehicle overall?
A It was very clean.
Q Not a lot of clutter or things like that?
A Not a lot of clutter, not a lot of just random stuff stuffed in all the corners and stuff like that. There wasn't very much extra stuff in there at all.
Q Okay. And you did note that there was a puppy in the vehicle; is that correct?
A Yeah.
Q And was animal control contacted to take custody of the puppy?
A Yeah. We had contacted animal welfare and they responded and took custody of the puppy. And I gave them the defendant's information so that he could get his dog back eventually.
MR. GRIDLEY: Now if we can go ahead and resume the video.

(A portion of Exhibit 4 was played for the Court and witness.)

MR. GRIDLEY: Pause it, if you would, briefly.

Q (By Mr. Gridley) Again, you, very quickly thereafter, find the firearm we see on the video; is that correct?

A Yes.

Q And we can pretty well see it, but can you describe exactly where and how that was positioned?

A It was in the center console. I can't remember exactly how it was positioned in the center console, but, like, as soon as I opened it, it was pretty evident that there was a firearm just right there.

Q Okay.

A It wasn't tucked under anything or in a holster or anything like that.

Q Not a bunch -- under a bunch of clutter or anything like that, just right inside that center console; is that correct?

A Yes.

Q And did you eventually submit that or arrange for that firearm to be submitted into evidence with your department by way of another officer?

A Yes.

Q Okay. And did that -- was that, in fact, a Sig Sauer P365 with a Serial No. 66B168472?

A Yes.

MR. GRIDLEY: Now if we can move to about the ten-minute mark in the video.
Q (By Mr. Gridley) You also searched the trunk area; is that correct?
A Yes.
Q Anything of note in the backseat area?
A A lot of camping equipment, a lot of -- I think there was a lava lamp, which is kind of odd, but --
Q Was that in the backseat or the trunk area?
A The trunk -- in the trunk area.
Q Okay. And I'm asking you about the backseat.
Was there anything --
A Another officer was in the backseat. I don't think there was anything of note there.
Q Okay.
THE COURT: Let's be careful about not talking over each other.
Q (By Mr. Gridley) Nothing that you recall in the backseat area?
A No, sir.
MR. GRIDLEY: Now, if we can play from the ten-minute mark.
(A portion of Exhibit 4 was played for the Court and witness.)
MR. GRIDLEY: Will you pause it there.

Q (By Mr. Gridley) I think we can see there's a number of items that are kind of neatly tucked or packed away in the rear cargo compartment. Is that fair to say?
A Yes.
Q And what type of items were these --
A It was like --
Q -- generally speaking?
A Looked like camping equipment. There was a whetstone for, like, sharpening knives, a range finder.
Q Okay. Kind of survival type of equipment?
A Yeah.
Q Okay. Knives, things of that nature?
A I don't recall specifically any knives but --
Q A knife sharpener?
A There was definitely a knife sharpener. There was a nice whetstone in there.
Q It seemed to be pretty high-end equipment?
A It was nice, new, in the box.
Q Okay. Overall, I think you indicated that the vehicle was very clean, uncluttered?
A Yes.
Q Well-organized, would you say?
A Yes.
Q Okay. Did you find any evidence inside that vehicle that seemed to relate to anyone other than Mr. Wiggins in

particular?
A No.
MR. GRIDLEY: Pass the witness.
THE COURT: Any questions from the defendant?

**CROSS-EXAMINATION**

BY MS. BLUMERT
Q Officer Loewer, why were you searching that car?
A It's standard procedure for a vehicle impound.
Q Why was the vehicle being impounded?
A The owner was under arrest.
Q Is that required?
MR. GRIDLEY: Judge, I would object. I don't see that this is relevant for the purpose of this hearing.
THE COURT: Overruled.
Q (By Ms. Blumert) Are you required to impound a vehicle upon arrest?
A Not necessarily. Depends on the circumstances.
Q What circumstance was present here that made you decide to impound it?
A It was in a public parking lot and there wasn't any -- wasn't, like, on his property or anything like that. It was going to be in the way if it was left there. It was parked right in front of some dumpsters.
It was a small parking lot in a busy business. So there's not really a place you could leave the car right there

where it wouldn't be in the way.
Q It was on the McDonald's private property lot; correct?
A Uh-huh.
Q Did you ask Mr. Wiggins whether anyone else was available to drive it?
A I didn't personally.
Q Do you know whether anybody did?
A I do not.
Q Okay.
MS. BLUMERT: Nothing further.
THE COURT: Anything further from the government?
MR. GRIDLEY: Just one question.

**REDIRECT EXAMINATION**

BY MR. GRIDLEY
Q Was there anyone else there with Mr. Wiggins that was readily available to drive the vehicle away?
A No.
MR. GRIDLEY: That's all I have.
THE COURT: Anything further from the defendant?
MS. BLUMERT: No, your Honor.
THE COURT: Sir, thank you for your time and testimony. You are excused.
Any further witnesses from the government?
MR. GRIDLEY: Yes, your Honor. I would call Agent Brian Anderson with ATF.

THE COURT: Sir, please come forward and be sworn. Come right up here next to the podium and the clerk will place you under oath.

(The witness was duly sworn.)

THE CLERK: Thank you. Please have a seat.

**BRIAN ANDERSON,**

called as a witness herein, having been first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. GRIDLEY

Q Please state your name.
A Brian Anderson.
Q And what do you do for a living, sir?
A I'm a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives here in Oklahoma City.
Q Okay. Are you also trained as a nexus agent?
A I am.
Q Can you briefly describe for the Court what that entails?
A It's the examination of any firearms that have been recovered or seized during incidents to determine whether or not that firearm -- to form our best opinion to determine if that firearm was manufactured in the State of Oklahoma and if it had crossed interstate lines to reach the State of Oklahoma.
Q Did you become involved in the investigation of this case

we're here on today involving Mr. Wiggins' arrest at the McDonald's on October 30, 2022?
A Yes, sir.
Q And did you eventually obtain custody of the Sig Sauer P365 pistol bearing Serial No. 66B168472?
A Yes, sir.
Q And did you perform a nexus examination on that vehicle -- or on that firearm? Excuse me.
A I did.
Q And what was the conclusion of your nexus examination?
A It was my opinion that that firearm was not manufactured in the state of Oklahoma and, therefore, had to cross state lines and effect interstate lines.
Q Did you also, at my request, look into and research the ownership of the Mercedes SUV that was in question as a part of this arrest?
A I did, yes, sir.
Q And did you, in fact, determine that the defendant, Mr. Wiggins, was the registered owner of that vehicle?
A Yes, sir.
Q And did you, in fact, determine that he had purchased that vehicle back in August of 2022?
A Yes, sir.
MR. GRIDLEY: Pass the witness.
THE COURT: Any questions from the defendant?

MS. BLUMERT: No, your Honor.

THE COURT: Sir, thank you for your time and testimony.

THE WITNESS: Thank you, your Honor.

THE COURT: You can return to the table.

Any additional witnesses from the government?

MR. GRIDLEY: Briefly, your Honor. We'd call agent -- or Officer Steve Ritchey.

THE COURT: Sir, you'll recall that you are under oath.

THE WITNESS: Yes, sir.

THE COURT: All right. You can return to the seat.

**STEVE RITCHEY,**

recalled as a witness herein, having previously been duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MR. GRIDLEY

Q You indicated previously that you were assigned to supervise the defendant, Mr. Wiggins, in this case; is that correct?

A That's correct.

Q Okay. And was part of his conditions that he would update you on the place where he lived as well as the vehicles that he operated or owned?

A Yes.

Q Okay. And at some point in time did you receive information that he was -- around August of 2022 that he was purchasing a white Mercedes SUV?
A Yes. Around the middle of August he sent me a text message with the actual listing from Landers.
Q Okay. And so as of the time of his arrest, was it your understanding that that was a vehicle he was operating and owned?
A He had that and a motorcycle.
Q Did you also have an opportunity or occasion to visit his home prior to his arrest?
A I did.
Q Okay. And did you notice anything in particular that he would keep in his home that kind of -- out of the ordinary?
A Not prior to his arrest. We did a search of the residence afterwards, and there was a bunch of knives, axes, rope, night vision goggles, drones.
Q Kind of survival-ish type of equipment? Is that fair to say?
A Yes. There were water purification tablets and things of that nature.
Q And where was his apartment?
A It was on the southwest side of Norman.
Q Now, I want to talk to you about the circumstances in which you --

MR. GRIDLEY: May I have just a moment?

(Brief pause.)

Q (By Mr. Gridley) -- in which you initially came into the position of supervising the defendant. That was back in May of 2022; correct?

A Yes.

Q Okay. And, in fact, you were made aware that he was released from Texas state custody related to his murder conviction May 18th of 2022; is that correct?

A Yes.

Q Okay. Are there rules in place that govern when he is supposed to actually report to you?

A Yes. He's supposed to, within 72 hours, check in with us.

Q Okay. Did that happen?

A It did not.

Q Okay. What did you -- did you take any steps to kind of investigate that?

A I was in contact with his sister prior to his release and after his release. She had not heard from him. And then on the 23rd of May -- so approximately five days later -- I'm sorry -- on the 22nd of May she said that he was still in El Paso and she was getting him a bus ticket.

And then on the 23rd, I got a call from him that he was in Oklahoma. And then they came in the following morning on

the 24th for his initial intake.
Q Okay. Was that the first time you were actually able to meet with him?
A Yes.
Q And did he provide you with any information about what happened with regard to his initial release?
A He had wandered into Mexico for a few days.
Q Gone to Mexico?
A Yes.
Q Okay. And is that allowed under the rules of his supervised release?
A No.
Q Did he also indicate to you that he had been using drugs at that time?
A Yes. He said he had smoked some high-grade marijuana prior to his arrival -- after his arrival into Oklahoma and prior to his arrival in my office.
MR. GRIDLEY: That's all I have.
THE COURT: Any questions from the defendant?
MS. BLUMERT: Yes, Judge.

**CROSS-EXAMINATION**

BY MS. BLUMERT
Q While you were supervising Mr. Wiggins, he had to obtain a driver's license; correct?
A That's correct.

Q Okay. Because he didn't have one when he got out of prison?
A Right.
Q And he was able to get a Real ID; right?
A Yes.
Q So he had, like, collected all the official documents and went and got one of those?
A I would assume so, yes.
Q Are you aware whether somebody can get one of those if they have a pending warrant?
A I have no idea.
Q Once he bought the Mercedes, he titled it and registered it correctly, as far as you know; right?
A Yes.
Q You said that you had actually received it -- was it a paper copy of what looks like a warrant?
A In the Norman police report that I received, there was a copy of the paper warrant in there.
Q And it looks to have been issued April 14th of 2022.
A I -- if you say so. I don't have it in front of me so ...

MS. BLUMERT: May I have a moment, Judge?

THE COURT: Yes.

(Brief pause.)

Q (By Ms. Blumert) Mr. Ritchey, you don't have any reason

to dispute that it was April 14, 2022; right?
A No, I do not.
Q Okay. As far as you understand, based on the date that Mr. Wiggins was released, he would have still been in Texas' custody at that point; right?
A That's correct.
Q So when he was released in May, Texas appeared to not have any detainers on him; right?
A It appeared that way, yes.
Q Because they released him?
A Right.
Q And, typically, you'd expect, when someone is getting released from custody, if they have detainers, those would activate at that point; right?
A If most cases, yes. People do release with detainers from other places or with pending cases or warrants that detainers hadn't been lodged yet. It depends. I mean, we see it to where people are released that have active warrants.
Q When Mr. Wiggins got arrested in October of '22, he's been in continuous custody in Oklahoma to the present day; correct?
A That's correct.
Q Okay. You're not aware of any point him being taken to court in Texas?
A No.

Q Okay. So as far as you know, it seems like that warrant was lifted without him having to appear?
A It would appear so. I'm not sure, but I would assume that he hasn't left the state for that.

MS. BLUMERT: Nothing further.

THE COURT: Anything further from the government?

MR. GRIDLEY: No, your Honor.

THE COURT: Sir, thank you for your time and testimony.

Any additional evidence from the government?

MR. GRIDLEY: Your Honor, the government would rest at this time.

THE COURT: Any evidence from the defendant that you would present on the question of revocation of the term of supervised release?

MS. BLUMERT: No, your Honor.

(End of requested excerpt.)

CERTIFICATE OF OFFICIAL REPORTER

I, Christina L. Clark, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 4th day of August, 2024.

s/CHRISTINA L. CLARK
Christina L. Clark, RPR, CRR